**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAROL MONTAGANO *ex rel.* WENDY GIANO, | |
| Plaintiff, | Civil Action No. 16-9375 (MAS) (DEA) |
| v. | **MEMORANDUM OPINION** |
| SAFECO INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

**SHIPP, District Judge**

This matter comes before the Court on twin motions for partial summary judgment. The first is from Plaintiff Carol Montagano ("Montagano") (ECF No. 73), to which Defendant Safeco Insurance Company of America ("Safeco") opposed and Montagano replied (ECF Nos. 75, 82). The second is from Safeco (ECF No. 74), to which Montagano opposed and Safeco replied (ECF Nos. 78, 81). The Court has carefully considered the parties' submissions and decides the motions without oral argument under Local Civil Rule 78.1. For the reasons below, the Court denies both motions.

I.    **BACKGROUND**

In this insurance dispute, an insured seeks damages from her insurance company for breaching its insurance policy (the "Policy").[1] Resolution of this dispute involves sticky legal issues regarding the New Jersey Automobile Reparation Reform Act (the "No-Fault Act") and the remedies available to an insured. Because the issues involved are primarily legal, before turning to the facts of this case, the Court devotes most of this background to describe the legislative history of the No-Fault Act and the contours of a life care plan, the primary remedy Montagano asserts in this case.

A.    **The New Jersey No-Fault Act**

As this matter involves an automobile accident that occurred in 1975, the 1975 version of the No-Fault Act controls. At the time, the statute required that "[e]very automobile liability insurance policy insuring an automobile as defined in this act against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, maintenance or use of an automobile shall provide additional coverage." L. 1972, c. 203, § 3, at p. 782 (codified at N.J. Stat. Ann. 39:6A-4 (West 1972)). The statute defined "additional coverage" to include "medical expense benefits," which required "[p]ayment of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident." L. 1972, c. 203, § 3, at p. 782 (codified at N.J. Stat. Ann. 39:6A-4(a)).

The New Jersey Legislature's 1972 enactment developed from recommendations from the Automobile Insurance Study Commission (the "Commission") that sought to end New Jersey's

---

[1] Neither party can apparently locate a copy of the Policy. (Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 15, ECF No. 73-2 ("Safeco has represented to Mrs. Montagano that all copies of the Policy were destroyed or lost and are not presently available for review or inspection."); Def.'s Reply to Pl.'s SUMF ¶ 15, ECF No. 75-1 ("Mrs. Montagano has not been able to locate her copy of the [P]olicy either.").)

fault-based tort system for automobile accidents. *Gambino v. Royal Globe Ins. Cos.*, 429 A.2d 1039, 1041-42 (N.J. 1981). The Commission proposed solving four main objectives in any no-fault system: (1) "prompt and efficient provision of benefits for all accident injury victims," (2) "reduction or stabilization of the prices charged for automobile insurance," (3) "ready availability of insurance coverage necessary to the provision of accident benefits," and (4) "streamlining of the judicial procedures involved in third-party claims." *Id.* at 1042 (citation omitted). Of the four, the first objective was the "primary purpose" of any newfound system. *Id.*; *see also Mody v. Brooks*, 772 A.2d 21, 24 (N.J. Super. Ct. App. Div. 2001) ("The fact that any automobile accident victims received inadequate reimbursement for their injuries, or none at all, was considered a major deficiency . . . causing substantial and unwarranted hardship for such victims." (quoting Cynthia M. Craig & Daniel J. Pomeroy, *New Jersey Auto Insurance Law* § 4.1 (2001)); *Roig v. Kelsey*, 641 A.2d 248, 249 (N.J. 1994) ("The No-Fault Law's goal was compensating a larger class of citizens than the traditional tort-based system and doing so with greater efficiency and at a lower cost." (internal quotation marks and citations omitted)).

To that end, the statute hardwires in a "liberal[] constru[ction] so as to effect the purpose." N.J. Stat. Ann. § 39:6A-16 (West 1972). Courts followed that broad interpretation. For example, in *Amiano v. Ohio Casualty Insurance Co.*, the New Jersey Supreme Court wrestled with whether the No-Fault Act covered a plaintiff whose only auto insurance was his wife's policy. 424 A.2d 1179, 1181 (N.J. 1981). In answering that question in the affirmative, the court stressed that

> [t]he No Fault Act is social legislation intended to provide insureds with the prompt payment of medical bills, lost wages and other such expenses without making them await the outcome of protracted litigation. Mandated as a social necessity, PIP [personal injury protection] *coverage should be given the broadest application consistent with the statutory language.*

*Id.* (emphasis added). The New Jersey Supreme Court reiterated that view five years later in deciding that an insurance provider must cover the cost of a van to transport the insured. *See Stewart ex rel. Stewart v. Allstate Ins. Co.*, 510 A.2d 1131, 1133 (N.J. 1986).

Another objective of the No-Fault Act was "to minimize the workload placed upon the courts by enabling losses to pass into claims . . . with a minimum of judicial intermediation." *Gambino*, 429 A.2d at 1042 (citation omitted). As recounted by the New Jersey Supreme Court, the New Jersey Legislature was acutely aware of the delays in compensation that resulted in courts frequently adjudicating fault. *See id.* at 1042-43; *Roig*, 641 A.2d at 249 ("[A]nother major benefit of the proposed system would be a reduction of the present court backlog." (emphasis omitted) (quoting Governor's Second Annual Message (January 11, 1972))). Accordingly,

> [i]n interpreting the statute to give full effect to the legislative intent, then, the statutory language must be read, whenever possible, to promote prompt payment to all injured persons for all of their losses. Consequently, approaches which minimize resort to the judicial process, or at least do not increase reliance upon the judiciary, are strongly to be favored.

*Gambino*, 429 A.2d at 1043 (citing, among others, *Amiano*, 424 A.2d at 1181).

## B.    The Life Care Plan

Much of this dispute focuses on the propriety of Montagano's request for a life care plan. A life care plan is "a determination of what services are required for an individual to function that would not have been required absent a specific injury." *Late v. United States*, No. 13-756, 2017 WL 1405282, at *5 (M.D. Pa. Apr. 20, 2017); *see also* Bryan Slaughter, *Craft a Credible Life Care Plan*, 47 Trial 22, 24 (June 2011) ("A life care plan is a comprehensive, dynamic document that details all of the future care a client will need and how much it will cost."). Life care plans have many uses but plaintiffs most often employ them in personal injury and workers' compensation

cases. *See* 1 Kenneth H. Levison *et al.*, Litigating Major Automobile Injury and Death Cases §
10:5 (Oct. 2021).

Montagano prepared a life care plan for Giano for this lawsuit. (*See generally* Sept. 24,
2019 Life Care Plan for Wendy Giano, Ex. 76, ECF No. 77-76.) The life care plan assumes Giano
will live another thirty-six years and projects outward expenses for two models—one assuming
Giano stays at home (roughly $16 million) and another assuming she stays in a facility (almost
$15 million). (*Id.* at *3, *13-30.)[2] More specifically, the plan projects the costs of particular
medical services based on Giano's current pattern of care. Examples include "projected
evaluations" for physical therapy, neurobehavioral evaluations, primary care visits, dental care
visits, and medications. (*E.g.*, *id.* at *13-18.) For its part, Safeco reviewed the life care plan and
(perhaps unsurprisingly) returned with smaller figures: roughly $7.5 million for Giano's home
care, just over $10 million for facility and group home care, and more than $7.6 million for facility
and nursing home care. (Life Care Plan Review, Ex. 78, ECF No. 77-78.)

C.      **Safeco's Coverage of Giano's Personal Injury**

Which brings the Court to the tragic events that led up to Montagano's request for a life
care plan. A 1975 automobile accident robbed Wendy Giano of most of her functional life. (Def.'s
SUMF ¶¶ 1, 3, ECF No. 74-3.) Another driver struck the vehicle seating the three-month-old
Giano, causing the passenger-side crank handle to impale her skull. (Pl.'s SUMF ¶¶ 1-3, 5.) As a
result of the accident, Giano suffered permanent and debilitating injuries, leaving her with the
mental capacity of a one- to three-year old. (Def.'s SUMF ¶ 3.) To date, Montagano has served as
Giano's primary caregiver at the Montagano residence. (Pl.'s SUMF ¶¶ 18, 21.)

---

[2] Pin-cites preceded by asterisks indicate the pagination atop the CM/ECF header.

Both parties agree that Giano requires 24-hour care as her condition will not improve. (Pl.'s SUMF ¶ 8.) In that regard, virtually no dispute exists that Safeco must cover "reasonable and necessary medical expenses resulting from personal injuries that [Giano] sustained in the accident." (Def.'s Reply to Pl.'s SUMF ¶ 17; *see also* Def.'s SUMF ¶ 10 ("Safeco has been affording PIP coverage to Ms. Giano for the past 44 years . . . .").) The dispute instead largely focuses on what qualifies as reasonable and medically necessary. For example, as Safeco sees it, it "has never refused to pay for medical care or treatment Ms. Giano needed." (Def.'s SUMF ¶ 35 (internal quotation marks omitted).) Montagano denies that assertion, noting that "Safeco has refused to pay for . . . the addition to the Montagano residence, the whole house generator, the attendant care services provided by Mrs. Montagano, and professional nursing services." (Pl.'s Reply to Def.'s SUMF ¶ 35, ECF No. 76.) In addition, the parties vigorously dispute whether Safeco has any obligation to pay for a life care plan for Giano.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.   **DISCUSSION**

The parties ask the Court to resolve three primarily legal questions. The first is whether Montagano is entitled to a jury trial for her breach-of-contract and declaratory judgment causes of action. The second is whether the 1975 version of the No-Fault Act authorizes a life care plan as a

remedy. The final question is whether the No-Fault Act permits backpay to Montagano as medically necessary personal injury protection ("PIP") benefits.

In answering these questions, the Court is cognizant that it is not writing on a blank slate. In July 2017, the Court denied Safeco's motion to partially dismiss Montagano's Amended Complaint. There, Safeco argued—as it does now—that the No-Fault Act forecloses future expenses in a life care plan because the statute applied to "incurred" losses only. (*See generally* Def.'s Mot. to Dismiss Moving Br. 3-6, ECF No. 7 ("Nowhere in [the No-Fault Act] is there allowance for an insurance carrier to make a prospective payment to fund a Life Care Plan for medical expense benefits that have not yet incurred.").) The Court rejected that argument for two reasons. First, it noted that Montagano brought a breach-of-contract claim and that damages in the form of an annuity were a permissible remedy for that claim. *See Montagano ex rel. Giano v. Safeco Ins. Co. of Am.* (*Montagano I*), No. 16-9375, 2017 WL 2918913, at *5 (D.N.J. July 7, 2017), ECF No. 13 ("[W]e find that seeking damages in the form of an annuity is appropriate relief for a breach of contract, and at this early juncture of the litigation, we will not limit the available remedies for the alleged breach." (listing cases)). Second, it analyzed New Jersey caselaw and determined that the "New Jersey No-Fault Act does not foreclose liability because the medical benefits have not yet been provided." *Id.* at *6 ("New Jersey courts have acknowledged that the statute permits an indefiniteness in future benefits that an injured person may receive." (listing cases)).

The Court weighed in again three years later. It first denied Montagano's motion for partial summary judgment that sought a conclusive judgment that the Policy and the No-Fault Act entitled her to backpay. As they do here, the parties disputed whether Montagano provided her services gratuitously and whether Montagano could reap the benefits of Safeco's savings for not having to

cover a professional nursing service. (*See generally* Pl.'s First Summ. J. Mot. Moving Br. 12-19, ECF No. 39-1; Def.'s Opp'n Br. to Pl.'s First Summ. J. Mot. 4-15, ECF No. 43.) Nonetheless, the Court reasoned that "resolution of this dispute would necessarily require it to make credibility determinations and 'weigh the evidence and determine the truth of the matter,' which is not permitted on a motion for summary judgment." *Montagano ex rel. Giano v. Safeco Ins. Co. of Am.* (*Montagano II*), No. 16-9375, 2020 WL 3513491, at *2 (D.N.J. June 29, 2020), ECF No. 60 (citing *Anderson*, 477 U.S. at 249). The Court also denied Safeco's motion for partial summary judgment for procedural reasons. *Id.* at *3-4.

In addition, in resolving the present motions, the Court notes that the parties ask it to resolve novel issues regarding New Jersey insurance law and the remedies available to insureds under the No-Fault Act. The Court is especially cautious to do so. None of Montagano's causes of action facially raise provisions of the No-Fault Act. Nor does the Amended Complaint raise any substantive question of federal law. Further, resolution of these legal questions could disrupt the no-fault insurance regime that the New Jersey legislature thought best to establish decades ago. *Cf. Lac D'Amiante de Quebec, Ltee. v. Am. Home Assur. Co.*, 864 F.2d 1033, 1043-44 (3d Cir. 1988) ("While courts have identified the likelihood that federal adjudication would disrupt an important and complex state regulatory scheme as the preeminent consideration in deciding whether *Burford* abstention is appropriate, one additional factor has also come into prominence: federal courts more readily abstain from a case that contains no issue of federal law." (citations omitted)). The Court will exercise its discretion to not abstain from answering these questions but will proceed carefully, mindful of the federalism concerns this case excites.

### A.    A Bench Trial Is Appropriate for Montagano's Causes of Action.

Turning to the first question, Safeco argues that Montagano has no right to a jury trial under the Seventh Amendment of the U.S. Constitution and parallel New Jersey law. Under those

authorities, only "[s]uits at common law" enjoy the jury-trial right. U.S. Const. amend. VII; *see also Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 59 A.3d 561, 568 (N.J. 2013) ("Only those actions that triggered the right of a jury trial that predated our State Constitutions, and those that were created anew with enactment of New Jersey's 1776 Constitution, the 1844 Constitution, or the 1947 Constitution serve as the basis for that constitutional right today." (quoting *Ins. Co. of N. Am. v. Anthony Amadei Sand & Gravel, Inc.*, 742 A.2d 550, 554 (N.J. 1999))). Safeco urges that Montagano's breach-of-contract and declaratory judgment claims flout that test because each sound in statutory benefits due under New Jersey's No-Fault Act. (Def.'s Second Summ. J. Mot. Moving Br. 4-5, ECF No. 74-2.) Montagano counters that *Montagano I* confirmed her entitlement to a jury trial and that, in all events, her claims are quintessentially suits at common law because they seek money damages. (Pl.'s Opp'n Br. to Def.'s Second Summ. J. Mot. 16-19, ECF No. 78.)

The Court agrees with Safeco that no right to a jury trial exists here. New Jersey law is clear that, regardless of the styling of a plaintiff's cause of action, "there is no right to a jury trial for PIP benefits where the issue is what benefits, if any, are due." *Manetti v. Prudential Prop. & Cas. Ins. Co.*, 482 A.2d 520, 521 (N.J. Super. Ct. App. Div. 1984); *cf. GEICO v. Korn*, No. 14-5742, 2016 WL 1597240, at *3 (D.N.J. Apr. 21, 2016) ("Legally—at least for pleading purposes—there seems to be no difference between a breach of PIP insurance contract claim and a statutory claim for PIP benefits." (citation omitted)). The Amended Complaint plainly alleges that Safeco failed to pay benefits that are medically necessary. *See* N.J. Stat. Ann. § 39:6A-4(a) (mandating coverage for medically necessary expenses). The breach-of-contract claim seeks $150,000 in damages for the "fail[ure] to pay" the "medically necessary" addition to Montagano's home, the "fail[ure] to pay" the "medically necessary" care provided by Montagano, and the "fail[ure] to fund" the life care plan. (Am. Compl. ¶¶ 132-34, ECF No. 5; *see also id.* ¶ 127

(describing the life care plan as "reasonable and necessary medical care").) The cause of action puts squarely at issue what PIP benefits Safeco owes, extinguishing Montagano's right to a jury trial.

Buttressing the Court's conclusion is what the Amended Complaint does not allege. It does not allege, for example, a claim for punitive damages—a recognition that the No-Fault Act does not permit punitive damages. *See* N.J. Stat. Ann. 39:6A-5(c); *Milcarek v. Nationwide Ins. Co.*, 463 A.2d 950, 954 (N.J. Super. Ct. App. Div. 1983) ("N.J.S.A. 39:6A-5(c) was intended as the exclusive remedy for an aggrieved plaintiff, thereby precluding an award of punitive damages."). In other words, Montagano's claim is markedly different than a breach-of-contract claim for punitive damages with allegations of malicious and wanton conduct. *See Pickett v. Lloyd's*, 621 A.2d 445, 455 (N.J. 1993) ("[W]rongful failure to pay benefits, wrongful withholding of benefits or other violation of the statute does not thereby give rise to a claim for punitive damages." (listing cases)). Relatedly, the Amended Complaint does not allege an independent tort that suggests that Safeco could be liable for something more than PIP benefits. *See Endo Surgi Ctr., P.C. v. Liberty Mut. Ins. Co.*, 919 A.2d 166, 170 (N.J. Super. Ct. App. Div. 2007) ("[A]n insured still may pursue a claim for compensatory and punitive damages for an 'independent tort' committed by an insurance carrier in response to a claim for benefits . . . ." (quoting *Pickett*, 621 A.2d at 455)). The absence of these allegations shores up that the Amended Complaint sounds in statute, not common law.[3]

Montagano's declaratory judgment claim does not alter this conclusion. Montagano argues that her declaratory judgment claim really seeks "general contract damages" because it requests

---

[3] Montagano appears to recognize as much as she quotes and analyzes the No-Fault Act extensively in her Renewed Motion for Summary Judgment, where she argues that the statute recognizes recovery of backpay. (*See generally* Pl.'s Second Summ. J. Mot. Moving Br., ECF No. 73-1.)

calculable medical expenses. (*See* Pl.'s Opp'n Br. to Def.'s Second Summ. J. Mot. 19.) She relies

principally on *Ward v. Merrimack Mutual Fire Insurance Co.*, where the court upheld the right to

a jury trial because the plaintiff sought "fire insurance coverage for damages already incurred" and

not "specific performance for future harms." 711 A.2d 394, 396-97 (N.J. Super. Ct. App. Div.

1998). According to Montagano, the life care plan and backpay align more closely with an award

of quantifiable past damages rather than a decree of specific performance for future harms.

Montagano's argument requires the Court to elucidate the distinctions between legal and

equitable remedies. When plaintiffs bring a claim for money damages, they ask for quintessential

legal remedies, thereby entitling them to a jury trial. Claims for specific performance, on the other

hand, sound in equity and no jury-trial right attaches. Courts, however, must be diligent in

determining the substance of the relief sought to ensure that crafty pleading does not defeat the

historic distinction between law and equity. That determination is especially significant here as

"the terms 'damages' and 'specific relief' have been 'used in the common law for centuries.'"

*Bowen v. Massachusetts*, 487 U.S. 879, 918 (1988) (Scalia, J., dissenting) (citation omitted).

Indeed, the history reveals that little substance separated a suit for contract damages from a suit

for specific performance for past-due contractual payments:

> [A] suit seeking to recover a past due sum of money that does no
> more than compensate a plaintiff's loss is a suit for damages, not
> specific relief; a successful plaintiff thus obtains not a decree of
> specific performance requiring the defendant to pay the sum due on
> threat of punishment for contempt, but rather a money judgment
> permitting the plaintiff to order "the sheriff to seize and sell so much
> of the defendant's property as was required to pay the plaintiff."

*Id.* (quoting E. Allan Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum. L. Rev. 1145,

1152 (1970)). But equally clear is that common-law courts found contract suits seeking specific

performance to sound in equity when they raised something more than past-due obligations:

> Those rare suits for a sum of money that were not suits for money damages (and that resulted at common law in an order to the defendant rather than a judgment executable by the sheriff) did not seek to compensate the plaintiff for a past loss in the amount awarded, *but rather to prevent future losses that were either incalculable or would be greater than the sum awarded.* Specific relief was available, for example, to enforce a promise to loan a sum of money when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or *to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions.*

*Id.* (emphases added) (citations omitted) (citing multiple treatises).

So, the question becomes does Montagano's declaratory judgment action align more closely with a suit seeking "to recover a past due sum of money that does no more than compensate [her] loss" or one seeking "to prevent future losses that were either incalculable or would be greater than the sum awarded"? The Court concludes that the second is the better analogue. The heart of the Amended Complaint is relief in the form of a life care plan, which by its terms is "an organized, concise plan for current and future care needs." (Pl.'s Ex. 76, ECF No. 77-76, at 3.) The Amended Complaint clarifies that part of the reason Montagano seeks a life care plan is so that Giano no longer has to "deal with the outrageous conduct of Safeco and its failure to timely respond to the legitimate, reasonable and necessary medical requirements of [Giano]." (Am. Compl. ¶ 125; *see also* Pl.'s Opp'n Br. to Def.'s Second Summ. J. Mot. 1 ("As a result of Safeco's repeated and continued breach of its contractual obligations, Plaintiff seeks an annuity to fund [Giano's] life care plan to prevent Safeco from further interfering with [Giano's] medical treatment, especially when Plaintiff is no longer here to advocate on [Giano's] behalf.").) In other words, Montagano seeks a decree to frontload millions in likely future medical expenses based on Safeco's past conduct. On these facts, Montagano's request for a life care plan is almost indistinguishable from the common-law plaintiff seeking specific performance of "future monthly payments" from a

defendant that "consistently refused to make past payments concededly due." *Bowen*, 487 U.S. at 918 (Scalia, J., dissenting).[4] As both rest in equity, the Court concludes that a bench trial is proper for resolving this matter.

**B.      As It Existed in 1975, the No-Fault Act Does Not Categorically Bar Future Medical Expenses in the Form of a Life Care Plan.**

The Court turns next to the second question. Safeco argues that, as a matter of law, the No-Fault Act bars Montagano from seeking a life care plan. Safeco does not point to a specific statutory prohibition on that recovery; rather, it recycles its argument from its motion-to-dismiss briefing that because the No-Fault Act applies to "incurred" expenses, it cannot apply to future expenses. To that end, Safeco invites the Court to engage in statutory construction of the verb "incurred," urging that the past-tense conjugation suggests that the No-Fault Act limits damages to costs already borne by insureds.

Safeco's argument is not without merit. In *Sanner v. GEICO*, for example, the court construed the term "incurred" in the No-Fault Act to mean when an insured pays expenses or becomes liable to pay expenses. 376 A.2d 180, 182 (N.J. Super. Ct. App. Div. 1977) ("If [an insured] neither pays the expenses nor becomes liable to pay them, we fail to see how it can be said, with any degree of realism, that [the insured] has incurred such expenses."), *aff'd*, 383 A.2d 429 (N.J. 1978). The facts of *Sanner* exemplify why that court reached that conclusion. The insured received gratuitous medical services from the federal government and then sought reimbursement

---

[4] Separately, characterizing the life care plan as one-time specific performance (rather than contract damages) fits neatly with the No-Fault Act's purpose of avoiding multiple lawsuits for past-due obligations. *See Gambino*, 429 A.2d at 1043 ("In interpreting the [No-Fault Act] to give full effect to the legislative intent, then, the statutory language must be read, whenever possible, to promote prompt payment to all injured persons for all of their losses. Consequently, approaches which minimize resort to the judicial process, or at least do not increase reliance upon the judiciary, are strongly to be favored.").

from his private insurer for those services. *Id.* at 181-82. Concerned by the windfall to the insured, the court reasoned that the New Jersey Legislature included the incurred requirement to avoid "double recovery of . . . expenses" and "recovery by an insured where liability for such expenses was not incurred or paid." *Id.* at 183. Subsequent courts recognize that *Sanner* signifies that an insurance provider's liability is limited to incurred expenses. *E.g.*, *Bernick v. Aetna Life & Cas.*, 386 A.2d 908, 912 (N.J. Super. Ct. App. Div. 1978); *Maros v. Transamerica Ins. Co.*, 388 A.2d 971, 976 (N.J. 1978) (Schreiber, J., dissenting); *Kenelia v. Glens Falls Ins. Co.*, 408 A.2d 144, 147 (N.J. Super. Ct. Law Div. 1979).

*Sanner* and the like, however, exist in some tension with more recent cases. As discussed in *Montagano I*, several cases establish that the "New Jersey No Fault Law does not foreclose liability because the medical benefits have not yet been provided." 2017 WL 2918913, at *5. In *Ochs v. Federal Insurance Co.*, for example, the New Jersey Supreme Court grappled with the No-Fault Act's statute of limitations. 447 A.2d 163, 165 (N.J. 1982). There, the court adopted the rule that an insured's claim under the No-Fault Act begins to run from the date of the accident or the date the insured knew injuries accrued from the accident. *Id.* at 166-67 (citing *Danilla v. Leatherby Ins. Co.*, 403 A.2d 925, 927 (N.J. Super. Ct. App. Div. 1979)). Notably, the court rejected an approach that the statute of limitations began to run "after the injured person incurs an expense." *Id.* (alterations and emphasis omitted). It reasoned that an expense-based approach failed to comport with the legislative intent of the No-Fault Act: "the Legislature intended all injuries flowing from a single accident to stand on equal footing with regard to their compensability. We know of no statutes of limitation providing otherwise." *Id.* at 166. Further, the court expressly rejected that the limitations period began running from the date of the last expense incurred

because the New Jersey Legislature intended that plaintiffs would bring PIP suits as one-time declarations of liability:

> Moreover, the "last expense" approach ignores the fact that a suit to recover PIP benefits seeks essentially a declaration of liability. It is not necessary to present an enumeration of the specific expenses. Once liability is established, the carrier is responsible for *all* medical expenses related to the accident. The interpretation suggested by plaintiff contradicts the policy underlying the statute. The need for repose and certainty in human affairs argues in favor of encouraging prompt filing of claims.

*Id.* at 167; *see also Amiano*, 424 A.2d at 1181 ("The No Fault Act is social legislation intended to provide insureds with the prompt payment of medical bills, lost wages and other such expenses without making them await the outcome of protracted litigation").

That approach—that liability flowed from the underlying accident and not the underlying expenses—carried through to subsequent cases. For instance, in *Zupo v. CNA Insurance Co.*, the court grappled with applying the No-Fault Act's statute-of-limitations to a recurring condition. There, a car accident left the plaintiff with severe physical injuries and an osteomyelitic infection that the insurance provider covered; but years later and outside the limitations period, the plaintiff suffered a recurrence of the osteomyelitis that the insurance provider refused to cover. 474 A.2d 259, 261-62 (N.J. Super. Ct. App. Div. 1984), *aff'd as modified*, 483 A.2d 811 (N.J. 1984) (per curiam). The court began by noting that this case differed from *Ochs* because here the "carrier ha[d] acknowledged its responsibility to pay PIP benefits." *Id.* at 263. It iterated that the No-Fault Act encompasses "the right of an insured to receive payment from his PIP carrier for *all medical expenses incurred* by him in connection with a compensable injury irrespective of the amount of the expenses *or the length of the time during which they are incurred.*" *Id.* (emphases added). Accordingly,

> when a carrier acknowledges its responsibility for medical expenses by the unambiguous act of making payment, it is also necessarily

> assuming the responsibility to continue to make future payments for
> an indefinite period of time provided only that the claimed medical
> expenses are related to and are necessitated by the original
> occurrence.
>
> Thus, if an insured suffers from a medical problem requiring
> continuing treatment, his right to payment from his PIP carrier is
> vouchsafed for the indefinite future.

*Id.*; *see also Rahnefeld v. Sec. Ins. Co. of Hartford*, 560 A.2d 670, 675 (N.J. 1989) (applying *Zupo*

analysis to cases where "injuries were of such a nature that future treatment was contemplated and

reasonably necessary").

So what does this all mean for Safeco's motion? New Jersey caselaw is clear that an

insurance provider's liability is limited to "incurred" expenses. It is also clear, however, that the

No-Fault Act envisioned liability for reasonably contemplated future expenses—particularly

where a provider has already covered expenses incurred by the insured. What is less clear is what

Safeco asks for: a declaration that the No-Fault Act does not contemplate a frontloaded payout of

all future expenses. Considering the above authorities, the Court cannot say that the No-Fault Act

categorically bars a life care plan. Here's how the Court sees it. The No-Fault Act envisions at

least three scenarios:

1. For injuries resulting from an accident, the insurance provider is liable for no expenses because the insured has not incurred any expenses. (*Sanner*)

2. For injuries resulting from an accident, the insurance provider becomes liable for all expenses that the insured has incurred. (*Ochs*)

3. For recurring and episodic injures resulting from an accident, the insurance provider becomes liable for all expenses that the insured has incurred and expenses that the provider knows are reasonably likely to incur in the future. (*Zupo*)

The Court more or less agrees that a life care plan would be improper in the first two scenarios. Those scenarios implicate the precise windfall concerns that roused the *Sanner* Court—namely, that insureds might fully recover from their injuries and then reap a windfall from lifelong life care plans. The "incurred" requirement therefore protects providers from paying out on medically unnecessary expenses and protects the courts from unnecessary litigation.

The same cannot be said, however, for the third scenario. There, the insureds face only a remote possibility of a windfall because the insurance provider is already on the hook for all future medical expenses. *See Zupo*, 474 A.2d at 263 ("[I]f an insured suffers from a medical problem requiring continuing treatment, his right to payment from his PIP carrier is vouchsafed for the indefinite future."). That's especially so when—like here—the insurance provider knows from the outset that the insured will suffer lifelong complications from an accident and has already covered medically necessary procedures stemming from those complications. To say otherwise would contravene the social purpose of the No-Fault Act and grant insurance providers far more leverage than the New Jersey Legislature sought in crafting this remedial legislation. *See Amiano*, 424 A.2d at 1181 ("Mandated as a social necessity, PIP coverage should be given the broadest application consistent with the statutory language."). The life care plan remedy also comports with the swift judicial resolution contemplated by the No-Fault Act's drafters as it allows for a one-time declaration of both liability and damages. *See Gambino*, 429 A.2d at 1042 ("The legislation . . . was designated 'to minimize the workload placed upon the courts by enabling losses to pass into claims . . . with a minimum of judicial intermediation.'" (second alteration in original) (citation omitted)).

In other words, the Court agrees with Safeco's construction of the term "incurred" but disagrees that it necessarily applies to this case. Unquestionably, Safeco is liable for all medically

necessary expenses incurred by Giano. *See Sanner*, 376 A.2d at 182. But it is also responsible "to continue to make future payments" for all "claimed medical expenses [that] are related to and are necessitated by" Giano's personal injury. *Zupo*, 474 A.2d at 263. A life care plan is simply a vehicle for Montagano to seek as damages those future payments. That Montagano has not yet incurred those costs is no defense *to damages* under *Zupo* and its progeny: so long as Montagano will continue to incur expenses related to her personal injury, Safeco must cover them. Safeco's "incurred" defense may be a defense *to liability*, but the Court does not read Safeco's motion as arguing for a bar to future medical coverage. Nor could Safeco realistically argue as much, as it has already agreed to cover many of the procedures that will continue into the future and thus be incorporated into Giano's life care plan. (*See* Def.'s SUMF ¶ 10 ("Safeco has been affording PIP coverage to Ms. Giano for the past 44 years . . . .").) The Court accordingly will not bar, as a matter of law, Montagano from seeking a life care plan under the 1975 version of the No-Fault Act.

A word of caution, however. None of this analysis should suggest that a life care plan and all of its attendant expenses are necessarily the correct or exclusive remedies in this case. Like any other type of damages, Montagano has the burden of proving that a life care plan is warranted. Further, like any other expense under the No-Fault Act, the expenses in the life care plan must be reasonable and medically necessary. *See* N.J. Stat. Ann. § 39:6A-2(e). Thus, at trial, Safeco may argue that the estimated expenses in the life care plan are so remote as to be unreasonable and medically unnecessary. The Court cannot make that determination now because what qualifies as a reasonable expense turns on weighing the evidence and determining credibility—which, as the Court intonated in *Montagano II*, it will not engage in at this stage. *See* 2020 WL 3513491, at *2 ("[R]esolution of this dispute would necessarily require it to make credibility determinations and

'weigh the evidence and determine the truth of the matter,' which is not permitted on a motion for summary judgment." (citing *Anderson*, 477 U.S. at 249)).

    **C.**    **The Court Will Await Trial for Resolution of Montagano's Claim for Backpay.**

    Both parties move for summary judgment for a judicial declaration that the No-Fault Act either permits or bars Montagano's claim for backpay. Montagano renews her argument that Safeco has essentially conceded its liability for her backpay. Safeco counters that Montagano provided her services gratuitously and that therefore no backpay expenses exist for it to reimburse. The Court already considered this issue in *Montagano II*, concluding that the backpay claim involved weighing evidence and determining credibility that precluded summary judgment. *Id.* at *2. The Court's conclusion remains true today: determining whether Montagano's backpay is reasonable is prototypically the role for a factfinder to consider at trial.

    Montagano attempts to circumvent this conclusion by pointing to new evidence that Safeco compensated Giano's sister, Lisa Allen, for babysitting services. (Pl.'s Second Summ. J. Mot. Moving Br. 26-27.) The Court is not persuaded. For one, Safeco appears to have compensated Allen through a monthly stipend for general expenses paid to the Montaganos. (*Id.*) Even stronger though, the evidence does not convince the Court that no genuine dispute of material fact exists here. Montagano's argument amounts to this: her claim for backpay for her around-the-clock care is reasonable and medically necessary because Safeco compensated Allen for babysitting services. The evidence, however, is equivocal at best. For example, Safeco might use the same evidence to show that although Allen's babysitting services are medically necessary, Montagano's requested backpay for 24-hour care is not. Because neither party shows that no genuine dispute of material fact exists, the Court denies both motions.

IV.    **CONCLUSION**

For the reasons above, the Court denies both motions for summary judgment. It will issue an order consistent with this Memorandum Opinion.

The Court further reiterates that this case is essentially one for PIP benefits under the No-Fault Act. The parties should accordingly comport their litigation practices with the purposes of the Act—specifically, resolution of the "*prompt* payment to all injured persons for all of their losses." *Gambino*, 429 A.2d at 1043 (emphasis added); *see also Velli v. Rutgers Cas. Ins. Co.*, 608 A.2d 431, 432 (N.J. 1992) ("Th[e No-Fault Act's] purpose is the swift delivery of contractual PIP benefits without regard to fault, and without protracted litigation, to defray the economic costs of auto accidents."). This case has been pending for more than six years, a far cry from swift judicial resolution. The Court thus instructs the parties to file joint correspondence that apprises the Court of proposed trial dates and the parties' trial readiness within seven days of this Memorandum Opinion's issuance.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE